# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**FINAL EXPENSE DIRECT**,

    Plaintiff,

v.                                                          Case No. 8:23-cv-2093-WFJ-AAS

**PYTHON LEADS, LLC**; **JACQUELYN
LEAH LEVIN**; and **DAVID LEVIN**,

    Defendants.

_____/

## ORDER

Before the Court is Python Leads, LLC ("Python"), Jacquelyn Leah Levin, and David Levin's (collectively, "Defendants") Motion to Dismiss (Dkt. 29). Final Expense Direct ("Plaintiff") has responded in opposition (Dkt. 29), and Defendants have replied (Dkt. 33). Upon careful consideration, and with the benefit of full briefing, the Court denies Defendants' Motion.

## BACKGROUND

Plaintiff sells life insurance policies. Python sells lead generation services. While the two only worked together for a brief period of time, their business relationship resulted in multiple lawsuits and over $100,000 in settlement payments. Plaintiff now seeks to pierce the corporate veil and hold all Defendants responsible through causes of action ranging from breach of contract to civil conspiracy.

## I.        Factual Background

Plaintiff maintains that the parties' relationship began sometime during January 2020 when Ali Raza reached out to Plaintiff on behalf of Python. Dkt. 25 at 5; Dkt. 25-26 at 3.[1] At this time, Mr. Raza essentially claimed that the company he worked for could generate final expense insurance leads which amounted to pre-closed sales. Dkt. 25-26 at 3. Plaintiff's Vice-President of Marketing, Luis Beauchamp, responded with four questions: "live transfers?", "offshore call center?", "TCPA compliant data with verifiable proof of opt-in?" and "hold harmless agreement?".  *Id.* at 2 (cleaned up). While Plaintiff does not explain how Mr. Raza answered Mr. Beauchamp's questions, the parties presumably continued to discuss the possibility of a business relationship for some months. *Id.* Mr. Raza eventually represented that Python's transfers would be "fully [TCPA] Complaint and DNC scrubbed" and that Python could hold Plaintiff "100%" harmless through its up to $1,000,000 in Berkshire Hathaway litigation insurance. Dkt. 25-18 at 2–5.

Plaintiff claims that it entered into an official contract with Python for live lead transfer services on March 15, 2021 (the "March Agreement"). Dkt. 25 at 5. The March Agreement was rather simple. Indeed, beyond establishing that transfers

---

[1] Despite Plaintiff's representation to the contrary, it is unclear that Mr. Raza was actually working on Python's behalf at this time. Mr. Raza's email signature in his January 2020 email correspondences identifies him as the "Head of Operations" for "Absolute Communication" (which is then qualified as "A Final Expense Call Center"). Dkt. 25-26 at 4. Mr. Raza's later email signatures, beginning as early as February 26, 2021, identifies him as "Co-Founder" of "Python Leads LLC." Dkt. 25-18 at 4.

would take place between traditional working hours and that payment eligibility would be limited to transfers who remained on the phone with Plaintiff for at least five minutes, the March Agreement contained three material terms:

> [(1)] It is the sole responsibility of [Python] to familiarize with all laws and regulations applicable with TCPA, FEDERAL AND STATE DO NOT CALL REGISTRY! And it will hold [Plaintiff] harmless from and against any and all claims, costs, actions, losses, expenses, liabilities, and damages ("Claims") arising from the Undersigned's breach of the Agreement or this Addendum or failure to ensure that the Leads provided to your company comply with the terms of the TCPA.[2]

> [2] According to the agreement [Plaintiff] is agreeing in paying the price of $55/per Live Transfer Lead first week! And from 2nd week it will [be] $65 Per Live Transfer[,] 3rd Week it will be $75 per [Live] Transfer. However both parties have AUTHORITY to rewise [*sic*] the price with prior notice and agreed upon by both Parties . . . [Python] will send an invoice of last week billable transfers on every Monday, and [Plaintiff] will process the payment on Tuesday of each week.

> [(3)] No modification of this Agreement shall be considered valid unless made in writing and agreed upon by both Parties.

Dkt. 25-1 at 3 (cleaned up). Kim Wilhelm signed the March Agreement on behalf of Plaintiff. *Id.* Ms. Levin, however, *did not sign* the March Agreement on behalf of Python. *Id.* Plaintiff acknowledges that it "does not have a copy of the [March] Agreement that is signed by both parties." Dkt. 25 at 5 n.1.

Notwithstanding the absence of Ms. Levin's signature, Plaintiff avers that, "[a]t all times relevant to this action, the Parties acted in accordance with the terms

---

[2] *See generally* the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

of [the] [March] Agreement." *Id.* at 5–6. First, Python or its agents allegedly affirmed the March Agreement's terms in electronically signed emails. *See* Dkt. 25-2 at 2–8 (emails apparently showing that Plaintiff was attempting to pay Python through the banking information contained in the March Agreement, which turned out to be Ms. Levin's personal account); Dkt 25-18 at 2–5 (emails between Mr. Raza and Mr. Beauchamp prior to the March Agreement in which Mr. Raza represents that Python has "[u]nlimited [d]efense through [B]erkshire [H]athaway for litigation issues" in response to Mr. Beauchamp requesting a "sample call/ sample script. And sample agreement with hold harmless language").

Second, Python's "subsequent invoicing was consistent with" the March Agreement. *See* Dkt. 25-5 at 2 (first week billing invoice); Dkt. 25-6 at 2 (second week billing invoice); Dkt. 25-7 at 2 (third week billing invoice).

Third, Python consistently represented that they bore the responsibility of ensuring TCPA compliance and handling all claims. *See* Dkt. 25-11 at 2 (Ms. Levin stating in email that "[Python] will always take responsibility in protecting you against these professional scammers"); Dkt. 25-12 at 2 (Ms. Levin stating in email that "[Python] will contact him and get this resolved for you" after Plaintiff contacted Ms. Levin concerning another complainant represented by an attorney); Dkt. 25-10 at 2 (Mr. Raza explaining in email that "we are scrubbing out data against TCPA

and DNC litigator list . . . [y]ou guys are completely harmless"). Plaintiff maintains that the March Agreement always controlled the parties' conduct.

As time went on, Plaintiff received a significant number of complaints alleging TCPA violations. Python ostensibly handled them while acknowledging its responsibility to do so until June 2022. *See generally* Dkt. 25-11; Dkt. 25-12; Dkt. 25-9. Plaintiff nevertheless questions whether Python actually secured releases in these instances or whether Python paid any settlements. Dkt. 25 at 15.

In June 2021, Python proposed a new arrangement (the "June Agreement"), which Python claims superseded the March Agreement. Dkt. 25 at 16; Dkt. 29 at 10. The June Agreement provided that payment eligibility would only be limited to transfers who remained on the phone with Plaintiff for at least three minutes and changed the billable rate to a flat $20 per eligible lead. Dkt. 25-15 at 2. More importantly, it included a disclaimer that materially altered the March Agreement's indemnity provision:

> Being a Lead provider[,] we use Opt-In Data from different sources and do our best to be [in] compliance with TCPA Regulations. Along with Lead ID we will provide the source IP of the Lead. And this is your responsibility to protect yourself against any cost, demands or damages in regards to TCPA Rules. Python Leads will not be responsible for any loss or damages in regards to TCPA.

*Id.* The June Agreement was signed by Ms. Levin on behalf of Python. *Id.* Plaintiff, however, *did not sign* the June Agreement. *Id.* Plaintiff maintains that, despite

negotiations, the June Agreement never became operational, and the parties never performed work or billed under its terms. Dkt. 25 at 16.

In June 2022, Plaintiff began receiving lawsuits against it for alleged TCPA violations. *Id.* at 17. It was around this point that Python's counsel contacted Plaintiff citing the June Agreement and explaining that Python had no responsibility for any of Plaintiff's losses or damages related to TCPA claims. Dkt. 25-16 at 2. Python's counsel attached an invoice that appears to reflect the billing terms of the June Agreement despite the flat rate being off by seven dollars. *Id.* at 4. Plaintiff claims that it never received this invoice and suggests that it was fabricated. Dkt. 25 at 18.

Ultimately, Plaintiff allegedly paid over $100,000 to settle the claims against it and ended its business relationship with Python. Dkt. 25 at 17–19. Plaintiff alleges that, considering all the facts, "the corporate form of [Python] should be disregarded as a sham" perpetrated by Mr. and Ms. Levin for the purpose of misleading companies like Plaintiff into relying on said individual's representations concerning TCPA compliance and indemnity protection. Dkt. 25 at 3–4; *see also* Dkt. 25-17 at 7 (Mr. Levin disclosing that "we do not think we can afford counsel right now" to a TCPA claimant's attorney despite earlier representations from Python concerning litigation insurance through Berkshire Hathaway).

## II.     Procedural History

On September 15, 2023, Plaintiff brought suit against Defendants. Dkt. 1. In response, Defendants moved to dismiss. Dkt. 21. Plaintiff subsequently filed the instant Amended Complaint. Dkt. 25. Therein, Plaintiff asserts eleven counts: Count I—breach of contract against Python; Count II—breach of contract against Ms. Levin; Count III—breach of implied-in-fact contract against Python and Ms. Levin; Count IV—promissory estoppel against Python and Ms. Levin; Count V—quantum meruit against Python and Ms. Levin; Count VI—violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201–501.203 against all Defendants; Count VII—fraud in the inducement against all Defendants; Count VIII—negligent supervision against Python and Ms. Levin; Count IX—fraudulent misrepresentation against all Defendants; Count X—negligent misrepresentation against all Defendants; and Count XI—civil conspiracy against all Defendants. *Id.* at 19–46. Defendants now move to dismiss everything except for Count IV (as to Python only) and Count V (as to Python only). *See generally* Dkt. 25. Defendants now move to dismiss the Amended Complaint. Dkt. 29.

## LEGAL STANDARD

A complaint withstands dismissal under Federal Rule of Civil Procedure 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

At the dismissal stage, a court may consider matters judicially noticed, such as public records, without converting a defendant's motion to one for summary judgment. *See Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 52 (11th Cir. 2006). Additionally, documents may be considered at the dismissal stage if they are central to, referenced in, or attached to the complaint. *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Documents attached to a motion to dismiss may also be considered if the documents are (1) central to the plaintiff's claim, and (2) undisputed (if their authenticity is not challenged). *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

Defendants make four arguments for dismissal that cover multiple counts of Plaintiff's Amended Complaint. The Court will address these arguments before turning to consider Defendants' more focused challenges to Counts VIII and XI.

### I.    Veil Piercing

The first broad issue to consider is whether Plaintiff can bring claims against Mr. and Ms. Levin in their individual capacity. As Defendants note, "[a] general

8

principle of corporate law is that a corporation is a separate legal entity, distinct from the individual persons comprising them, and, absent some basis to pierce the corporate veil, there is no basis for imposing liability for corporate debts and obligations upon the individuals." *Beltran v. Vincent P. Miraglia*, *M.D., P.A.*, 125 So. 3d 855, 858 (Fla. 4th DCA 2013) (citing *Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008)). "[T]he corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 303 F. Supp. 3d 1282, 1286 (M.D. Fla. 2018) (citing *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1120 (Fla. 1984)). "The key, therefore, is deliberate improper conduct." *Id.* And this can be established by demonstrating the existence of three prerequisites:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998).

The Amended Complaint satisfies these veil piercing principles under a Rule 12(b)(6) standard. Accepting Plaintiff's allegations as true, as the Court must at this stage, "Python represented itself as being fully controlled by Mr. and Ms. Levin" to the extent that Python initially used Ms. Levin's personal bank account for receiving payments from Plaintiff. *See* Dkt. 25 at 4; Dkt. 25-2 at 2–8. Among other things, Mr. and Ms. Levin allegedly used this control to fraudulently induce Plaintiff into the March Agreement by representing that Python could ensure TCPA compliance and indemnify Plaintiff against all claims. Dkt. 25 at 3–4, 37. This plainly qualifies an intentionally improper or fraudulent use of Python. And it allegedly injured Plaintiff. *Id.* at 39. It follows that, when viewed in the light most favorable to Plaintiff, the Amended Complaint's allegations state a case for veil piercing that is plausible on its face. *See Johnson*, 303 F. Supp. 3d at 1287 (explaining that allegations that an entity 'was organized and incorporated with the fraudulent and improper purse of" holding and shielding assets sufficiently "state[s] a claim for piercing the corporate veil at the complaint stage"). Nothing more is required to survive a Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678.

## II.    Beach of Contract and Breach of Implied-in-Fact Contract

Defendants next argue that Counts I, II, and III fail because the March Agreement is not enforceable. Dkt. 29 at 9. Defendants maintain this to be the case for three reasons: "(1) Python did not execute, nor intend to be bound by the terms

of, the March Agreement; (2) the March Agreement was superseded by the June Agreement, which holds Plaintiff liable for all TCPA claims; and/or (3) Plaintiff unilaterally and voluntarily settled the alleged claims without Python. *Id.* at 10.

These fact-based arguments are unavailing. As explained above, at this stage, the Court is bound to accept Plaintiff's factual allegations as true, not Defendants'. *See Pielage*, 516 F.3d at 1284. It is therefore dispositive that Plaintiff plausibly alleges that Python intended to be bound by the agreement, Dkt. 25 at 11, that the March agreement was never superseded, *id.* at 16, and that Python had numerous opportunities to settle the alleged claims itself prior to Plaintiff doing so, *see* Dkt. 30 at 8–10. Indeed, these assertions alone create genuine issues of material fact which preclude dismissal of Counts I, II, and III. *See Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*, 147 F. App'x 841, 845 (11th Cir. 2005) ("The absence of a party's signature is not the death knell of a binding contract or amendment. Both Florida and Louisiana law acknowledge that the validity of an agreement may be shown by other acts of the parties.") The Court will not accept Defendants' invitation to convert the instant Motion to one for summary judgment.

### III.   Independent Tort Doctrine

Defendants' third argument focuses on the independent tort doctrine in an attempt to defeat Counts VI, VII, VIII, IX, X, and XI. Dkt. 29 at 17. Defendants essentially contend that these Counts are barred because they do not allege "any

injury that is separate and independent from Python's contractual obligations under the contract" and because "[a]ny duty that [Plaintiff] or Python may have owed each other would be based upon their contractual relationship[.]" *Id.* at 17–19.

These arguments fail for two reasons. To begin with, Defendants claim that the March Agreement "is not valid" and that they never "intended to be bound by [its] terms[.]" Dkt. 29 at 10. If this much is proven, the alleged injuries and breached duties raised by Plaintiff's tort claims would undoubtedly be independent from any contractual obligations imposed by the March or June Agreements. Such a possibility helps explain why, "[a]t the motion to dismiss stage, a plaintiff is entitled to make as many separate claims as she has regardless of consistency and regardless of whether they are based on legal, equitable, or [other] grounds." *Aznar v. Cooperativa De Seguros Multiples De Puerto Rico, Inc.*, No. 6:06-CV-578-19-DAB, 2006 WL 1540340, at *3 (M.D. Fla. June 5, 2006). This alone counsels against dismissal.

What is more, though, Plaintiff's tort claims would not be barred by the independent tort doctrine even if the March Agreement is found valid. As other courts have explained, the independent tort doctrine and its sister doctrine, the economic loss rule:

> ha[ve] not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts

12

that breached the contract. Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract.

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 402 (Fla. 2013) (citations omitted); *see also Spears v. SHK Consulting & Dev., Inc.,* 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) (describing "Florida's independent tort doctrine" as an "off-shoot of the economic loss rule" and explaining that, thereunder, a plaintiff cannot recast breach of contract claims as tort claims"). Further, to determine whether a tort claim is independent from a contract claim, courts look to the source of the duty allegedly breached:

> the distinction between a breach of contract and a tort is the source of the duty breached by the defendant. If a contract imposes a duty and the defendant breaches that duty, the plaintiff must sue for breach of contract. If society imposes the duty, the plaintiff must sue in tort. In other words, if the allegedly breached duty is contractual, the economic-loss rule prevents suing in tort.

*Travelers Indem. Co. of Connecticut v. Richard McKenzie & Sons, Inc.*, 326 F. Supp. 3d 1332, 1345 (M.D. Fla. 2018), *aff'd*, 10 F.4th 1255 (11th Cir. 2021). In this case, Counts VI, VII, IX, X, and XI all involve at least some allegations of a breach of common law or statutory duty that took place prior to the March Agreement. The March Agreement, moreover, arguably imposed compliance duties that were distinct from those imposed by common law concerning the supervision of employees. The Court therefore declines to apply the independent tort doctrine to dismiss Counts VI, VII, VIII, IX, X, and XI. Defendants may raise these arguments at a later stage.

13

### IV.    Heightened Pleading Standards under Rule 9(b)

Defendants' last muti-count argument concerns Federal Rule of Civil Procedure 9(b). Thereunder, a complaint asserting fraud or a claim sounding in fraud must set forth "(1) precisely what statements were made in what documents or oral representations; (2) the time and place of each such statement and the person responsible for making it; (3) the content of such statements and the manner in which they [are misleading]; and (4) what the defendants obtained as a consequence of the fraud." *Marksman Sec. Corp. v. P.G. Sec., Inc.*, No. 0:19-CV-62467-KMM, 2020 WL 12188373, at *7 (S.D. Fla. June 25, 2020) (internal quotations and citations omitted). Defendants maintain that the Amended Complaint has failed to do so with respect to Counts VII, IX, and X. Dkt. 29 at 20.

The Court disagrees. Counts VII, IX, and X allege fraud in the inducement, fraudulent misrepresentation, and negligent misrepresentation, respectively. Dkt. 25 at 37–39, 42–44. For each of these claims, Plaintiff alleged, among other things, that Defendants represented Python's leads to be DNC/TCPA scrubbed and that Python had up to $1,000,000 in litigation insurance; that these statements were made via email by Python or its agents; that the contents of these statements were false or misleading and that Defendants knew as much; and that Defendants obtained Plaintiff's business as a result of their misrepresentations when they otherwise would not have. *Id.* The Court consequently finds that Plaintiff has satisfied Rule 9(b).

14

## V.      Counts VIII and XI

Defendants' final arguments individually target Counts VIII (negligent supervision) and XI (civil conspiracy). Dkt. 29 at 19, 21. Defendants argue that Count VIII fails because the Amended Complaint contains no facts which support the notions that (1) Defendants "became or should have become aware of problems with any specific employee that indicated that employee's unfitness; and (2) failed to take further actions upon becoming aware of any specific employee's unfitness." *Id.* at 20. Defendants argue that Count XI fails because "Plaintiff fails to allege the existence of an agreement or any facts that would establish that [Defendants] had an agreement to commit any of the alleged torts" and because there is no "underlying wrong or tort" viably alleged. *Id.* at 22.

Both of these arguments ignore the facts pled throughout the Amended Complaint. Indeed, within Count VIII itself, Plaintiff alleges that:

> Defendant breached its duty to adequately supervise its employees by having received actual notice of the failure of the employees at the call to comply with TCPA and DNC regulations. *Quashen v. Carnival Corp.*, 576 F. Supp. 3d 1275, 1304 (S.D. Fla. 2021). On August 2, 2021, Defendants received notice from Mr. Beauchamp, Final Expense's Vice-President of Marketing, that an individual named Jonathan Lester claimed he was on the DNC list and did not authorize the transfer. (See Exhibit I, e-mail from Mr. Beauchamp to Python, dated August 2, 2021). Defendants' agent, Mr. Ali, recognized his failure to comply with TCPA regulations by acknowledging that Jonthan Lester was on the DNC registry list. (See Exhibit I, email from Python to Mr. Beauchamp, dated August 2, 2021, "He was not a professional Litigator- just a regular DNC- But If he approaches again Please let me know we will handle that our end- So he will not bother you again-").

Defendants did not take corrective actions to rectify its employees or agents' repeated violations of TCPA regulations, which led to additional complaints about same. For example, on August 19, 2021, Final Expense's Director of Sales, Jeff Laguerre, informed Mr. Beauchamp that a web complaint was filed by an individual named Hank Stram who complained that a vendor was calling people on the DNC list. (See Exhibit J, e-mail from Jeff Laguerre to Mr. Beauchamp, dated August 19, 2021). Mr. Beauchamp informed Mr. Raza about Stram's complaint and Mr. Raza advised that Python was scrubbing its data against TCPA and DNC lists. (See Exhibit J, e-mail from Mr. Raza to Mr. Beauchamp, dated August 19, 2021). On August 23, 2021, an individual named Wes Newman e-mailed Mr. Beauchamp complaining about receiving calls from Plaintiff's vendor. (See Exhibit H, e-mail from Wes Newman to Mr. Beauchamp, dated August 23, 2021). Mr. Beauchamp forwarded the message to Ms. Levin who, in response, assured him that she would contact Mr. Newman. On December 10, 2021, another individual named Jayana Eppler e-mailed a demand letter to Plaintiff regarding Plaintiff's vendor calling her even though she is on the National DNC registry list. (See Exhibit K, e-mail from Jayana Eppler to Plaintiff, dated December 10, 2021). Plaintiff forwarded Jayana Eppler's letter to Defendants regarding her claim. On January 31, 2022, Jayana Eppler complained again, via e-mail, that Defendants did not respond to her claim. (See Exhibit K, e-mail from Jayana Eppler to Final Expense, dated January 31, 2022, "I reached our last week to the lead vendor at the e-mail address you provided and I have not received a response.").

Dkt. 25 at 40–41. Count VIII therefore does allege notice and a failure to act. Defendants cannot plausibly claim otherwise.

Finally, Plaintiff has similarly alleged facts which state a plausible case for civil conspiracy. At the heart of this action is the contention that Mr. and Ms. Levin were jointly controlling Python for the purpose of misleading Plaintiff into doing business by creating a false sense of legitimacy around Python's business operations. *Id.* at 3–5, 44–45. Viewed from this perspective, and in a light most favorable to

16

Plaintiff, the Amended Complaint's factual assertions allow one to reasonably infer that Defendants agreed to do this and to commit the resulting torts alleged in Counts VII and XI.  This plausible inference allows Count XI to survive Rule 12(b)(6) review. *See Iqbal*, 556 U.S. at 678; *Milana v. Eisai, Inc.*, No. 8:21-CV-831-CEH-AEP, 2022 WL 846933, at *7 (M.D. Fla. Mar. 22, 2022) ("[I]n ruling upon a motion to dismiss under Rule 12(b)(6), the Court only analyzes whether a plaintiff's claims are plausible[.]").

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1)  Defendants' Motion to Dismiss (Dkt. 29) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, on February 7, 2024.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record